UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EDGAR PAZ,

                Petitioner,

-vs-                                           Case No.  8:10-cv-269-T-17AEP

SECRETARY, DEPT. OF CORRECTIONS,

                Respondent.

_____/

## ORDER

Before this Court is a timely-filed petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Edward Paz, a Florida prisoner. The petition attacks Paz's convictions for murder in the second degree and aggravated assault rendered in the Twelfth Judicial Circuit in Manatee County, Florida, in state circuit case number 2000 CF 1646.  Paz raised one ground for relief in the petition which was signed on December 22, 2009.  Paz specifically stated that "his Rule 3.850 motion contained the **sole claim presented in this present [federal] petition."**  (Doc. 1, p. 12).

Respondent filed a response to the petition on June 7, 2010.  Paz filed a motion for leave to file an amended petition signed June 9, 2010.  In that motion, he stated that he raised two grounds for relief in the original petition but failed to include supporting facts as to the second ground.  The Court analyzed the original petition and could not find that Paz raised a second ground in that petition.  However, in an abundance of caution, the Court granted Paz's motion for leave to file an amended petition, but stated that Respondent should respond only to ground two of the amended petition.

Now, the Court has before it Paz's amended petition (Doc. 15) on which he is proceeding; Respondent's response to the original and amended petition (Docs. 11 and 18); and Paz's reply. (Doc. 19).

PROCEDURAL HISTORY

On July 13, 2000, the State Attorney filed an Information charging Paz with second degree murder with a firearm (Count 1) and attempted second degree murder (Count 2). (Exhibit 1).  On March 16, 2001, a jury found Paz guilty of murder in the second degree as charged, and guilty of the lesser offense of attempted manslaughter. (Exhibit 2). On August 10, 2001, the trial court granted Paz's motion for a new trial based upon newly discovered evidence that another individual had been the shooter. (Exhibit 3). The State appealed the grant of a new trial and the Second District Court of Appeal, in Case No. 2D01-3889, issued a per curiam affirmance on March 21, 2003. *State v. Paz*, 845 So. 2d 199 (Fla. 2d DCA 2003).

The retrial began on December 6, 2004, before the Honorable Stephen L. Dakan, Senior Circuit Judge. Paz was represented by attorneys Richard Reinhart, Esquire, and Diana Moreland, Esquire. On December 10, 2004, the jury found Paz guilty of second degree murder with a firearm as charged in Count 1, and the lesser offense of aggravated assault with a firearm charged in Count 2. (Exhibit 4). On January 7, 2005, the court sentenced Paz to forty years incarceration with a mandatory term of twenty-five years on the second degree murder conviction, and three years imprisonment, concurrent, on the aggravated assault conviction. (Exhibit 5).

Paz pursued a direct appeal. J.L. "Ray" LeGrande, the Special Assistant Public Defender assigned to represent Paz on appeal, filed an initial brief (Exhibit 6) raising one

issue: THE COURT PERMITTED THE READING OF A WITNESS' PRIOR TESTIMONY WITHOUT MEETING *CRAWFORD'*S UNAVAILABILITY AND CROSS-EXAMINATION REQUIREMENTS.

The State filed its answer brief. (Exhibit 7). On August 18, 2006, in Case No. 2D05-431, the Second District Court of Appeal filed a per curiam unwritten opinion affirming Paz's convictions and sentences. (Exhibit 8). *Paz v. State*, 936 So. 2d 574 (Fla. 2d DCA 2006)[table]. The appellate court issued the mandate on September 8, 2006. (Exhibit 9).

On September 24, 2007, Paz, pro se, filed a Motion for Postconviction Relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure. (Exhibit 10). He filed an amended motion on January 5, 2008. (Exhibit 11). The single claim raised in both motions was whether trial counsel was ineffective for failing to adequately convey the State's plea offer, which rendered the waiver of the plea offer involuntary.

On June 30, 2008, the postconviction court issued an order summarily denying Paz's claim. (Exhibit 12). Paz filed a motion for rehearing (Exhibit 13), which the trial court denied on August 26, 2008. (Exhibit 14). Paz appealed the denial of his motion for postconviction relief. (Exhibit 15). No briefs were filed. On October 23, 2009, in Case No. 2D08-4692, the state appellate court filed a per curiam unwritten opinion affirming the denial of postconviction relief. (Exhibit 16). *Paz v. State*, 20 So. 3d 855 (Fla. 2d DCA 2009)[table]. The mandate was issued on November 17, 2009. (Exhibit 17).

STANDARDS OF REVIEW

AEDPA Standard

Under 28 U.S.C. § 2254(d) and (e) as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), this court's review of the state court's factual findings

must be highly deferential. Such findings are presumed to be correct unless rebutted by clear and convincing evidence. Similarly, the state courts' resolutions of issues of law-including constitutional issues-must be accepted unless they are found to be "contrary to" clearly established precedent of the Supreme Court of the United States or involve an "unreasonable application" of such precedent. *Williams v. Taylor*, 529 U.S. 362 (2000). Indeed, it is not enough that the federal courts believe that the state court was wrong; it must be demonstrated that the state court decision was "objectively unreasonable." Id. *Breedlove v. Moore*, 279 F.3d 952 (11th Cir. 2002).

Ineffective Assistance of Counsel Standard

To prevail on a claim of ineffective assistance of trial or appellate counsel, a Petitioner must meet the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland*'s two-part test requires a Petitioner to demonstrate that counsel's performance was deficient and "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* However, if a claim fails to satisfy the prejudice component, the court need not make a ruling on the performance component.

DISCUSSION

Ground One

DEPRIVATION OF RIGHTS AS SECURED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION THROUGH INEFFECTIVE ASSISTANCE BY COUNSEL'S FAILURE TO PROPERLY CONVEY A BENEFICIAL PLEA OFFER PRIOR TO GOING TO TRIAL.

Paz asserts trial counsel was ineffective for failing to properly convey a beneficial plea offer prior to going to trial. Paz alleges the following facts in support of this claim:

Petitioner, within his motion for post conviction relief filed in the Twelfth Judicial Circuit Court, Manatee County, Florida, alleged that Counsel was ineffective for failing to properly convey a ten year plea offer made by the State. He specifically claimed that he would have entered into the plea agreement if he had known what the potential penalties were if he was found guilty at trial, the strength of the State case, and the fact the prior testimony of a non-testifying eyewitness, Jeremy Freed, standing alone was sufficient for a conviction of second degree murder.

The trial court, on June 30, 2008, issued an order summarily denying the claim. The denial was based on the fact he had already been found guilty at his first trial and had some idea of the strength of the State's case. Further, after the first trial, where the court and Counsel were discussing the possible sentences he may be subject to, and also at the hearing held on the defense motion for new trial, where the potential penalties were discussed, he had to have become aware of the potential penalties at those times.

In a timely filed motion for rehearing, Petitioner presented facts which he asserted the court had overlooked: his inability at that time to understand much of the English language; his trouble understanding the interpreter that was provided; his mental and emotional state after having been found guilty off a crime he did not commit; the dialogue where he might have gleaned the information about the length of possible sentences was not directed at him but was between the court and Counsel; he did not understand that the State would be able to use the transcripts of Jeremy Freed's trial testimony at a second trial; he had just received a video confession from one of the men that was in the car from which the shot that killed the victim was fired claiming responsibility for the crime; and, Counsel had apprised him that if they went to trial they were going to obtain an expert witness that would testify that it was not possible for the driver, Paz, to have fired the shot that killed the victim from his position in the driver's seat. The motion was denied, and Paz appealed the final order to the Second District Court of Appeal, which resulted in an affirmance without explanation.

(Doc. 1 at pp. 6-7; Doc. 15 at p. 6)

There is some confusion as to whether Paz is referring to the first or second trial. In his motion for postconviction relief, Paz alleged the State offered a ten-year sentence in exchange for a plea prior to the first trial. There was another offer made before the second trial, but Paz did not allege what that offer entailed. (See Respondent's Exhibit 10 at p. 3). In his federal petition, Paz refers only to the ten-year plea offer made by the State which,

taken in context, appears to relate to the second trial. See § 2254 petition at p. 6.

Paz concedes counsel did convey an offer by the State; his complaint is that counsel allegedly failed to advise him of the maximum penalty he could receive if convicted after trial. Had he known of the possible penalties, Paz asserts, he would have accepted the plea offer rather than proceeding to trial. Paz timely raised this claim in his Rule 3.850 motion for postconviction relief in the state court. The postconviction court, after reviewing the entire record and properly applying the correct *Strickland* standard, summarily denied Paz's claim on the basis that Paz could not establish prejudice. The state court's order denying relief states in pertinent part:

> The Defendant claims that his counsel was ineffective by failing to adequately convey the State's plea offer to him. In support, the Defendant asserts that about three weeks prior to trial he spoke with his counsel and at that time, his counsel told him that the State's plea offer was 10 years. The Defendant argues that during that conversation his counsel never informed him about the potential penalties he was facing if found guilty. Additionally, the Defendant contends that his counsel did not advise him about the strength of the State's case. The Defendant asserts that his counsel subsequently visited him in jail and again communicated the plea offer but at no time mentioned the potential penalties the Defendant was facing. The Defendant concludes that if his counsel would have informed him of the potential penalties he was facing then he would have accepted the plea offer.

> As stated above, this was the Defendant's second trial pertaining to these charges. In the Defendant's initial trial, the jury found the Defendant guilty as charged in Count I and in Count II, guilty of the lesser-included offense of attempted manslaughter.[1] Following that guilty verdict, the Court, the State, and defense counsel discussed the possible sentences.

>> MR. SCHAEFER: Judge, the conviction I believe fits under the 10-20-life provisions, so there's a mandatory situation. It may be a mandatory life sentence, it may be 25 years.[2]

> Additionally, during the second hearing on the motion for a new trial,

---

[1] See Trial Transcript dated March 16, 2001 (Attach. 1), p. 774.

[2] Id. at 777.

the Court, in considering whether there was newly discovered evidence, explains that the Defendant may have to spend the rest of his life in prison.

> THE COURT: On the other hand there is now newly discovered evidence in the form of two admissible videotapes that contain admissions by Jorge Domensay, which, if true, establish that he, not Edgar Paz, was the shooter and the one responsible for Collozo-Deluna's death. Are Domensay's admissions reliable? If so, Edgar Paz should not go to prison for the rest of his life.[3]

> The Defendant was present during the trial and the hearing on the motion for new trial. The Defendant faced the identical charges in both trials. Based on the foregoing, the Defendant was aware that he was facing a potential sentence of 25 years or even life in prison if found guilty again. Also, the Defendant was privy to the strength of the State's case due to sitting through the initial trial. Accordingly, the Defendant was not prejudiced by his counsel's alleged omission and, thus, the motion is denied on this basis.

Exh 12: Order Denying Defendant's Motion for Postconviction Relief at pp. 2-3.

The state court decision is neither contrary to, nor an unreasonable application of United States Supreme Court precedent and is therefore entitled to deference under the AEDPA. In order to show a violation of the Sixth Amendment right to counsel, Paz must satisfy the two-pronged inquiry of *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Bell v. Cone,* 535 U.S. 685, 698 (2002)(courts should apply *Strickland* to claims that counsel failed to satisfy constitutional requirements at specific points). First, Paz must demonstrate that his attorney's performance was deficient, meaning that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Second, Paz must prove prejudice, in that he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, 466 U.S. at 694. A

---

[3] See Motion for New Trial Hearing Transcript dated August 10, 2001 (Attach. 2), p. 34.

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Paz must prove both prongs of *Strickland*. Therefore, if he fails to establish either deficient performance or prejudice, the court need not address the other prong. *Strickland,* 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice,...that course should be followed."); *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).

In this case, the state court correctly applied a *Strickland* analysis to Paz's ineffective assistance of counsel claim. It was extremely unlikely that Paz's four attorneys, throughout a four-year process that included two trials, never discussed the sentence Paz could receive if convicted as charged at a jury trial. Even if Paz's assertions are true, however, he is not entitled to relief. Paz was made aware of the potential penalty when he was present during a sentencing discussion after the first trial. (Exhibit 18). Paz argues that the sentencing discussion did not provide notice of the possible penalties because the discussion was not directed at him, but took place between the court and counsel, and Paz was unable to understand much English. See § 2254 petition at p. 7. This argument is unavailing.

Although English is Paz's second language, he understands spoken English and did not need an interpreter during trial except possibly to assist in translating a taped two-hour interview with police officers as to who was speaking and what was said. In an abundance of caution, a sworn interpreter was provided to Paz during trial on a stand-by basis in case

Paz had need for clarification of any of the testimony. (Exhibit 19). Paz had been tried and convicted by the jury at the first trial and he has not, and cannot, present a credible claim that he did not have substantial knowledge regarding the strength of the State's case and the evidence that would be used against him. Accordingly, the state court's rejection of Paz's ineffective assistance of counsel claim is neither contrary to, nor an unreasonable application of, Supreme Court precedent.

Ground one does not warrant habeas corpus relief.

### Ground Two

In Ground Two of the amended petition, Paz raises essentially the same claim presented to the state court in the direct appeal:

> WHETHER PETITIONER'S CONFRONTATION CLAUSE RIGHT WAS VIOLATED WHEN THE COURT PERMITTED THE READING OF A WITNESS'S PRIOR TESTIMONY WITHOUT MEETING CRAWFORD'S UNAVAILABILITY AND CROSS-EXAMINATION REQUIREMENTS.

As supporting facts, Paz asserts:

> Petitioner was deprived of his constitutional right to confrontation when the trial court permitted, over the object[ion] of counsel, the State to read to jury the prior testimony, given in a previous trial, by Jeremy Freed without the benefit of cross-examination. Whereas the trial court had failed to make sufficient findings of fact that the State exercised a sufficient degree of due diligence in attempting to procure the attendance of the witness and thus, contrarily applied the constitutional safe guards established by the Supreme Court in *Crawford.*

> Although Petitioner was afforded a previous opportunity to cross-examine the witness he contends the constitutional error in this case was harmful because his previous counsel's examination of the witness was [inadequate]. Previous counsel's examination did not attempt to challenge the credibility of the witness or to establish, through cross examination, whether there was a possibility the witness could have misidentified petitioner as the shooter due [to] a prior  altercation he had with Petitioner. The inadequacy of previous counsel's cross-examination was pointed out by new counsel, at his second trial, specifically counsel stated, "Mr. Schaefer's (previous counsel) cross deals basically with exhibits ... and people marking on

exhibits. I can't make hide nor hair out of what this cross-examination is about. So I think in essence it basically is not cross examination." In addressing Counsel's argument the court relied upon a State court decision in which derived from a case later receded from by the Supreme Court in *Crawford.*

(See Doc. 15 [amended petition] at p. 8).

Background

The state trial court granted Paz a new trial based on newly discovered evidence. The State appealed that ruling, and the Second District Court of Appeal silently affirmed the order granting a new trial in *State v. Paz*, 845 So. 2d 199 (Fla. 2d DCA 2003)(table). Paz's second trial was held in December 2004. During the second trial, pursuant to section 90.804(2)(a)[4] of the Florida statutes, the prosecutor sought to have read to the jury eyewitness Jeremy Freed's testimony given during Paz's first trial. Without the jury in the courtroom, the trial court heard testimony of the State's witnesses regarding the efforts to locate Freed. (Exhibit 20).[5] The court ruled that the witness was unavailable (Exh 20: T 355-356), and entertained argument from counsel for the State and defense as to whether Freed's prior testimony could be presented at the second trial under the prerequisites of section 90.804(2)(a).

---

[4] Section 90.804(2)(a), Fla. Stat. (2005), provides:

**(2) Hearsay exceptions**.--The following are not excluded under s. 90.802, provided that the declarant is unavailable as a witness:

(a) Former testimony.--Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

[5] Exhibit 20 is an excerpt of the hearing on the admissibility of the prior trial testimony of Jeremy Freed, found in Volume 7 of the record at T 338-361.

Paz's attorney, Mr. Reinhart, who did not represent Paz at the first trial, argued that even if the witness is unavailable, the question is does this come in under former testimony pursuant to 90.804(2)(a). He said he realized his client was the same party as before, but observed that Paz had new counsel. Reinhart said he had read the cross-examination by Attorney Schaefer at the first trial and he was "extremely concerned with it." *Id.* at 351. He said he believed the cross-examination was ineffective, stating:

> MR. REINHART: The reason I'm raising this to you is under my client's right to the counsel of his choice -- he has hired us on this case. Mr. Schaefer was his court-appointed attorney, but we're the new hired attorneys. Mr. Schaefer's cross deals basically with exhibits and stuff and people marking on exhibits. I can't make hide nor hair out of what this cross-examination is about. So I think in essence it basically is no cross-examination. And under the right to counsel clause, I would ask the Court to consider that.

*Id.* at 351.

A major thrust of defense counsel Reinhart's argument was that the defense was prevented from utilizing events which occurred after the first trial to impeach Freed at the second trial had Freed testified live. Reinhart said that since the last trial, Freed had been in "a lot of trouble." He noted that Paz's first trial was in March 2001 and on September 5, 2001, Freed had been arrested and charged and pled to grand theft. Freed was placed on probation, on December 13, 2002, and on May 5, 2003, he violated his probation and again pled. Reinhart said neither one of those situations resulted in jail time. *Id.* at 352. Reinhart said, "He's a witness for the State. This is a fertile area of cross-examination that we did not have the opportunity to develop last time, because this charge didn't exist at that time." *Id.* In addition, on November 29, 2001, Freed was charged with obtaining property in return for a worthless check. He was put on probation on December 19, 2002; again, he did not receive jail time. On January 28, 2003, Freed was arrested for domestic violence and the

State Attorney's Office later nolle prossed the charge. The day after that there was an injunction filed against him that was finalized in February 2003. *Id.* Reinhart said, "the man has been busy getting himself in plenty of trouble. We think that's an area of bias that could have been developed in trial today." *Id.* at 352-53. He noted they could not do that because Freed is not on the stand and they cannot develop that cross-examination that they think is important. He concluded the testimony should not come in as former testimony because they do not believe they had the opportunity or motive to develop cross-examination fully in the case. *Id.* at 353.

In rebuttal, the prosecutor opined the acts committed by the witness after he provided the prior testimony are not relevant. He argued Freed gave the prior testimony before any possible favor was granted to him by the State Attorney's Office, and that favors were granted had not been established. *Id.* at 354.

The trial court allowed Freed's prior testimony to be read back to the jury, with some limitations. The court ruled the State established unavailability, stating, "I don't think there's any question that they've established unavailability." Id. at 355-56. Further, the trial judge disagreed with the defense argument that the prior testimony was inadmissable due to inadequate cross-examination. The court remarked that "the Thompson case takes care of the Defense argument about the quality of what Mr. Reinhart believes was cross-examination." Id. at 356. In *Thompson v. State*, 619 So. 2d 261, 265 (Fla. 1993), the Florida Supreme Court opined:

> Thompson also asserts that, because the cross-examination of Barbara Savage at the first trial was brief and he did not have the opportunity to examine her in these proceedings, his right of confrontation under the Florida and United States Constitutions was violated. We find that all that is required is that the party have an <u>opportunity</u> at the prior proceeding to cross-examine the witness. *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597

(1980). Because Thompson's cross-examination of the witness in the first trial was brief, his right of confrontation in this second sentencing proceeding is not constitutionally impaired. We conclude that the trial court did not err in declaring the witness unavailable.

*Thompson*, 619 So.2d at 265 (emphasis in original).

When Reinhart said, "Mr. Freed's an eyewitness and he identifies my client[,]" the trial court said, "Well, he's not going to do that then . . . I mean, they can read some other stuff, but they're not going to be able to read the portion of the testimony that identifies your client." *Id.* at 356. Thereafter, the prosecutor asked if the court had ruled it was inadmissible, and the judge said, "Yes, sir." *Id.* at 357-58. The prosecutor then asked the trial judge if they could bring out page 121, lines 16 through 20, "the gentleman in the driver's seat pulled out a gun, a shot rang out, the gentleman fell." The judge said he did not have any problem with that. *Id.* at 358. The judge said the prejudice outweighed the probative value as far as any testimony about an <u>in-court</u> identification of Paz as the person who did the shooting. *Id.* at 358-59 (emphasis added). At the second trial, Jeremy Freed's testimony was read to the jury with the inadmissible portions omitted. (Exhibit 21).[6]

Paz did raise a constitutional confrontation issue on direct appeal in the state court. However, a review of the record shows Paz did not argue in the trial court that admission of Freed's testimony was a violation of *Crawford v. Washington*, 541 U.S. 36 (2004),[7] nor was there a claim at trial of a confrontation clause violation; rather, the focus was on the admissibility under Florida's evidentiary rules for former testimony. Consequently, Paz's

---

[6] Respondent's Exhibit 21 is an excerpt of the trial transcript which includes the read-back of Jeremy Freed's testimony at the second trial and appears in the record in Volume 9 at T 586-605.

[7] *Crawford* was decided March 8, 2004, and Paz's second trial took place in December 2004.

constitutional argument was not preserved for appeal. In its answer brief, the State first argued that the *Crawford* confrontation issue was not presented to the trial court, and therefore the issue was not preserved for review. (See Respondent's Exhibit 7 at pp. 24-33).

Paz has not properly exhausted his federal constitutional claim of violation of his confrontation rights because he did not fairly present such claim to the state trial court. Before seeking federal habeas relief, a state prisoner to satisfy the exhaustion requirement, 28 U.S.C. § 2254(b)(1), must "fairly present" his claim in each appropriate state court to alert that court to the claim's federal nature. *See Baldwin v. Reese*, 541 U.S. 27 (2004). Pursuant to *Duncan v.Henry*, 513 U.S. 364, 365 (1995), briefing an issue as a matter of state law is not sufficient to exhaust a federal claim on the same grounds. 513 U.S. at 366 ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.")

Paz could have alerted the state trial court that he was leveling a charge of a violation of the federal constitution. In *Baldwin*, the Supreme Court wrote that a petitioner wishing to raise a federal issue in state court can do so "by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Baldwin*, 541 U.S. at 32.

In Paz's direct appeal, the State correctly argued that the federal constitutional issue was not preserved for review, and could not be considered on the merits by the appellate court. In Florida, in order to preserve an issue for appellate review, specific legal argument or grounds upon which it is based must be presented to the trial court. *Occhicone v. State*,

570 So. 2d 902 (Fla. 1990), *cert. denied*, 111 S. Ct. 2067 (1991); *Tillman v. State*, 471 So. 2d 32, 35 (Fla. 1985). In Paz's case, no federal Confrontation Clause claim was advanced concerning the read-back of Freed's prior trial testimony. Citing *Mencos v. State*, 909 So. 2d 349 (Fla. 4th DCA 2005), in its answer brief in Paz's case, the State maintained Paz's current argument was not preserved for appeal. In *Mencos*, the defendant cited to *Crawford* and argued the trial court erred by allowing law enforcement officers to testify to a witness's statements because he did not have the opportunity to cross-examine the witness at trial. The Fourth District Court of Appeal of Florida found the defendant's *Crawford* objection was not properly preserved for appeal because he did not argue at trial that use of the hearsay evidence violated his constitutional right of confrontation nor did he assert a Sixth Amendment challenge; rather, he raised a hearsay objection. Importantly, the *Mencos* court observed: "The right of confrontation guaranteed by the Sixth Amendment 'differs from the kind of protection that is afforded by state evidence rules governing the admission of hearsay.'" *Mencos,* 909 So. 2d at 351 (citing *Lopez v. State*, 888 So. 2d 693, 697 (Fla. 1st DCA 2004)); *see also Rodriguez v. State*, 609 So. 2d 493 (Fla. 1992)(an appellate court may consider objections to admissibility of evidence only on grounds specifically stated at trial; when defendant raises a different ground on appeal, point is not preserved), *cert. denied*, 510 U.S. 830 (1993). In light of the fact that the *Crawford* issue was not fairly presented to the trial court, and had not been preserved for appellate review, this Court should determine that Ground Two of the instant petition is procedurally barred.

The state appellate court's silent affirmance does not affect the procedural default determination. In *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), the Supreme Court declined to apply the *Harris v. Reed*, 489 U.S. 255 (1989), presumption where the Virginia

Supreme Court stated plainly it was granting the Commonwealth's motion to dismiss a petition for appeal, which was based solely on Coleman's failure to meet state time requirements. The Court concluded the decision rested on grounds independent of federal law.

As in *Coleman*, the decision in this case follows an express assertion by the State of applicable state procedural grounds. Under the circumstances, the *Harris v. Reed,* presumption does not apply. *See Coleman*, 501 U.S. at 740 (The Harris presumption does not apply "in those cases where the relevant state court decision does not fairly appear to rest primarily on federal law or to be interwoven with such law." Instead, in such cases, "federal habeas courts must ascertain for themselves if the petitioner is in custody pursuant to a state court judgment that rests on independent and adequate state grounds.")

Neither the State nor the Florida courts need fear forfeiture of the application of its state procedural rules by gratuitously addressing the merits of issues in the alternative. "[W]here a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim." *See Alderman v. Zant*, 22 F.3d 1541, 1550 n. 10 (11th Cir. 1994) (collecting cases), *cert. denied*, 115 S.Ct. 673, (1994). Likewise, when the State asserted a procedural bar and the state courts did not explicitly address the issue, the presumption is that the procedural bar was applied in conformity with state law. *See Kight v. Singletary*, 50 F.3d 1539 (11th Cir. 1995); *Tower v. Phillips*, 7 F.3d 206 (11th Cir. 1993).

Claims that are procedurally defaulted in state court are not reviewable by this Court unless the petitioner can demonstrate cause for the default and actual prejudice,

*Wainwright v. Sykes*, 433 U.S. 72 (1977), or establish the kind of fundamental miscarriage of justice occasioned by a constitutional violation that resulted in the conviction of a defendant who was "actually innocent" contemplated in *Murray v. Carrier*, 477 U.S. 478, 496 (1986)(explaining a "fundamental miscarriage of justice" occurs "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent"). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In addition, "'to be credible,' a claim of actual innocence must be based on [new] reliable evidence not presented at trial." *Calderon*, 523 U.S. at 559 (quoting *Schlup*, 513 U.S. at 324). In the instant case, Paz cannot avoid the procedural bar because he has neither argued nor shown the existence of cause and prejudice. Moreover, he does not qualify for the fundamental miscarriage of justice exception because he has no new and reliable evidence of actual innocence. *Schlup v. Delo*, 513 U.S. at 321-322.

The procedural default doctrine and its attendant "cause and prejudice" standard are grounded in comity and federalism concerns, *Coleman v. Thompson*, 501 U.S. 722, 730, and apply whether the default occurred at trial, on appeal, or on state collateral attack, *Murray v. Carrier*, 477 U.S. 478, 490- 492 . Thus, a prisoner must demonstrate cause for his state-court default of any federal claim, and prejudice therefrom, before the federal habeas court will consider that claim's merits. 501 U.S. at 750. Ground two is procedurally barred.

Even if Paz's present constitutional claim were not procedurally barred, Paz is not entitled to habeas relief because Paz has not shown that his Sixth Amendment right of confrontation has been violated. In *Crawford v. Washington*, 541 U.S. 36 (2004), the

Supreme Court held that the Sixth Amendment's Confrontation Clause does not permit the introduction of out-of-court testimonial evidence unless the witness is unavailable and the defendant has had a prior opportunity for cross-examination. *Id.* at 68. Where testimonial evidence is at issue, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.*

In the instant federal case, Paz does not dispute that the witness was unavailable for the second trial, or that the opportunity for cross-examination existed. Rather, as he argued in the direct appeal in state court, Paz complains the cross-examination conducted by Paz's attorney at the first trial was inadequate or insufficient to satisfy the requirements of the Confrontation Clause of the Sixth Amendment.

In *Crawford*, the Supreme Court specifically discussed its earlier case of *Mattox v. United States*, 156 U.S. 237 (1895), which considered the admissibility of a deceased witness's prior trial testimony. The Court stated:

> In allowing the statement to be admitted, we relied on the fact that the defendant had had, at the first trial, an adequate opportunity to confront the witness: "The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination. This, the law says, he shall under no circumstances be deprived of . . ." Id., at 244, 39 L. Ed. 409, 15 S. Ct. 337.

*Crawford*, 541 U.S. at 57. As in *Mattox*, Paz had an adequate opportunity to confront and cross-examine Freed in his earlier trial.

The record supports a finding that the prior testimony was admissible under both state hearsay rules and the Confrontation Clause as interpreted in *Crawford*. Paz has not cited, nor has undersigned counsel's research revealed, any Supreme Court case holding that the quality, length, or effectiveness of the prior cross-examination of the testifying

witness is a factor for admissibility of the prior sworn testimony. All that is needed is the opportunity to cross-examine the witness, which occurred in Paz's case. The state court decision was neither contrary to, nor an unreasonable application of, Supreme Court precedent, and the decision is entitled to deference under the AEDPA.

Finally, even if there was a preserved error of constitutional magnitude in Paz's case, any such error was harmless under the facts and circumstances of Paz's case. The harmless error doctrine applies to violations of the Confrontation Clause. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). *See also, United States v. Glover*, 335 Fed.Appx. 35, 36, 2009 WL 1637794, 1 (11th Cir. 2009) (citing *United States v. Edwards*, 211 F.3d 1355, 1359 (11th Cir. 2000)).

A federal habeas court may grant habeas relief for a constitutional trial error only if it concludes that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). The evidence adduced at trial, contained in the statement of facts in the State's answer brief on direct appeal, is as follows:

> During the trial, Outer Limits patron, Armond Auchtung, testified he saw muzzle flash coming from the gun, which was out the window of the driver's door. (V7:T 272.) Auchtung demonstrated how the gun was positioned out the driver's window a couple of inches, i.e., the person holding the gun was showing his hand and part of his wrist. (V7:T 273.)

> Ryan Graham, head of security at Outer Limits at the time, was working with Joseph Monica, Wade Acheson, Chris Barns and Jeremy Freed. (V7:T 316.) He stated Freed is no longer employed at what is currently called "Club Heat," and he has not seen Freed in the last several months and has no idea where he is. (V7:T 336-37.)

> Graham said that, as a result of a disturbance at the bar, he and his fellow security personnel escorted some people from the bar to the back of the parking lot and the other group involved in the altercation was escorted to their car that was parked in the front row of the parking lot, near the front

door. (V7:T 317.) It was a Chrysler convertible. (V7:T 327.) Three to four people were escorted to that vehicle, which left and then returned. (V7:T 317-18.)

When the convertible returned, Graham said it came to a full stop in the turn lane on 41, heading northbound. (V7:T 318.) The people in that vehicle began shouting to the first group. (V7:T 318.) Two people from the crowd started toward 41, yelling back at the car. (V7:T 319.) Joseph Monica tried to grab the person to bring him back into the parking lot. (V7:T 319.) The man was facing the vehicle and Monica was facing the back of the man, so Monica was also facing toward the vehicle. (V7:T 321.) Monica was the person closest to the man who was shot, and the security person closest to the road. (V7:T 336.)

Chris Barns was also a bouncer working security at Outer Limits at the time. (V8:T 403.) When he became aware of other security personnel escorting some people outside, he ran outside to help. (V8:T 404-05.) Another bouncer named "Monica" was trying to restrain a gentleman who was going toward the car. (V8:T 407.) Monica was close to the person who was going into the street and talking to whomever was in the car. (V8:T 407-08.) Monica was just a few feet away from the person just prior to the shooting. (V8:T 410.)

Barns said he heard about four or five shots and he looked in the direction of where they were coming from, and saw they were coming out of the white vehicle. (V8:T 408.) It was the driver who was firing the shots. (V8:T 408.) Barns demonstrated that the hand doing the shooting was the right hand, which was extended out the window six inches or so. (V8:T 408-09.) Barns said he was focused on the driver's head and the flashes from the gun, which the driver was firing at a slight angle behind him. (V8:T 431.) Barns stated he saw the muzzle flash outside the vehicle in the area of the driver's side. (V8:T 409-10.) He did not have a good enough view from where he was to actually identify the person he saw shooting, but he knows it was the driver. (V8:T 410.)

Deputy Reginald Belvin was about a mile or so away when he heard sounds consistent with gunshots from the direction of the Outer Limits. (V8:T 433-34.) He heard approximately five shots, the first two were right behind one another, then there was a break of about a second or a second and a half, and then three more shots came right after that. (V8:T 434- 35.) He traveled toward the Outer Limits and saw a car that fit the description in the BOLO that was announced, and it was being followed by three other deputies, so Belvin joined in and took up pursuit. (V8:T 435-36.) The vehicle was eventually stopped and searched and they found a weapon under the passenger's seat. (V8:T 436-37.)

James Cates, Jr., a patron at the Outer Limits, testified he went to his car to get his cigarettes and saw a white Chrysler convertible with a black top stopped in the center lane and two people arguing with the people in the car, so he stood and watched to see what was going on, then everything started happening. (V8:T 449-51.) Cates saw muzzle flash coming from the driver's window. (V8:T 452.) The first one or two shots went "bang, bang", and then there was a pause, and then there were three or four more shots. (V8:T 455.) After the brief pause, they started shooting into the parking lot. (V8:T 454-55.) He actually heard projectiles making contact with structures, such as the bar. (V8:T 455.) Before the shots, Cates saw that the driver of the convertible appeared to be arguing with the people that were in the road. (V8:T 454.) The driver was facing toward the person who got shot and his mouth was moving. (V8:T 454.) He could tell it was an argument. (V8:T 454.)

Joseph Monica was working security for the Outer Limits club on June 25, 2000, at a Tex-Mex promotion night. (V9:T 560.) Monica said he was involved in escorting people outside the club and when he got outside, he saw a white car to which he escorted three gentlemen. (V9:T 561.) The men got into the car and they left going south, but then the car returned. (V9:T 562.) The car came to a stop in the median and some of the patrons in the parking lot went toward it and there were some words back and forth between them and the occupants of the vehicle. (V9:T 563.)

The victim was walking toward the street and he appeared to be pretty intoxicated and Monica was concerned he might get hit by a car, so he approached him and went to put his hand on the victim's shoulders, which he did for a second to pull him back. (V9:T 564.) Monica looked up, saw a gun and shots just rang out. (V9:T 564.) Monica saw the driver holding the gun. (V9:T 564.)

Monica said the lighting was fairly good; he had no difficulty seeing the driver holding the gun. (V9:T 565.) The first shot went out and the victim hit the ground and Monica hit the ground with him. (V9:T 565.) There were several shots after that. (V9:T 565.) Monica was in physical contact with the victim when he got shot and he felt the victim react physically to the shot. (V9:T 565.) Monica and Freed went with the police to another location where Monica saw the person who had been firing the gun and he identified him to the police as the person who fired the gun. (V9:T 568.) The person he saw firing the gun was in the driver's seat. (V9:T 568.)

Monica said when he was reaching out to put his hands on the victim's shoulders, he looked up to see what was going on with the occupants of the car to make sure they were not going to come toward them and have a confrontation in the street and that is when he noticed the gun and shots rang out. (V9:T 574.) The person who was the driver was wearing a white shirt and black pants and he had seen him in that clothing when he escorted him

and the others out to the car. (V9:T 580.) He could see the white shirt when the driver was shooting. (V9:T 581.)

. . . . .

Dianna Taylor was unit manager of the crime scene unit with the Manatee County Sheriff's Department and she was called to photograph the car. (V8:T 488-91.) The gun was on the floorboard behind the passenger seat. (V8:T 492.) She collected it and placed it into a bag for safe transport to the lab. (V8:T 492.) State's Exhibit 8A is the firearm she recovered. (V8:T 492.)

Dr. Joseph Tisone testified the victim sustained a gunshot entrance wound to his face, at the bridge of the nose, between the eyes. (V9:T 517-18.) The victim's injury was consistent with having been caused by a bullet fired from a .38 caliber pistol. (V9:T 521.) With a gunshot wound to the brain that caused this much injury, there would be sudden and rapid loss of consciousness and no control of the body from that point on. (V9:T 521.) In Dr. Tisone's opinion, the cause of the victim's death was cerebral lacerations and exsanguination due to a distant gunshot wound to the head. (V9:T 522.)

Detective Rick Gerken is with the Manatee County Sheriff's Office and he interviewed Appellant. (V9:T 610-11.) He identified Appellant in court as the one he interviewed on June 26, 2000. (V9:T 611.) He also identified State's Exhibit 7A and B as showing the way Appellant looked that night when he interviewed him. (V9:T 611.) In the photos, Appellant was wearing a white shirt and black pants. (V9:T 611-12.) State's Exhibit 7E shows a person associated with Appellant that night and he was wearing a checkered polo shirt and blue jeans. (V9:T 612.) State's Exhibit 7G is another person associated with Appellant that evening and he was wearing a black and white flannel shirt and black pants. (V9:T 612.)

Detective Hutto was with Gerken during the interview with Appellant. (V9:T 613.) Appellant was given his Miranda[8] rights from a form, which indicates Appellant was given his rights at 5:40 a.m. (V9:T 613-14.) Appellant indicated he understood his rights and agreed to talk with him in a taped interview. (V9:T 615.) State's Exhibit 12A and B are the tapes of their recorded interview. (V9:T 615.)

At the time of the interview, Appellant did not appear to be under the influence of intoxicants or anything that would have prevented him from understanding his rights. (V9:T 615.) He did not appear to be suffering from any mental disease or infirmity that would have prevented him from understanding his rights. (V9:T 615.)

---

[8] *Miranda v. Arizona*, 384 U.S. 436 (1966).

During the tape, Appellant said he and Jorge Domensay went to the Outer Limits at 11:00. (V9:T 622.) That night was the first time he ever saw the other man that was with him when he was arrested. (V9:T 622.) The man left with them in the car, but he did not go to the club with them. (V9:T 622-23.) Jorge told Appellant to give him a ride. (V9:T 629.)

Appellant first said, at the Outer Limits, Jorge told him it was time to leave and Appellant said, "all right, let's go[,]" and that was it. (V9:T 623.) Appellant said Jorge told him it was time to leave and told Appellant to drive because he was drinking. (V9:T 627.)

When asked what happened between him and some other people as far as an argument or something, Appellant said he did not know, that he did not even know anyone there because it was his first Sunday. (V9:T 628.) According to Appellant, he did not see any arguing or fighting or hear anything going on inside the club. (V9:T 628.) Appellant denied getting into an argument with anyone. (V9:T 630.) He denied that Jorge or Angel got into an argument, stating, "No arguments." (V9:T 631.)

Appellant said they the club left around two. (V9:T 631.) When they left, Appellant was driving, Jorge was the front seat passenger, and Angel got in the car and was in the back seat. (V9:T 632-33.) When asked when Angel got into the car, Appellant said he did not know. (V9:T 632.) Later, Appellant said Angel got into the car as Appellant pulled into the pawn shop. (V9:T 673.)

According to Appellant, no bouncers told him to leave. (V9:T 644.) He did say, however, when he was outside a bouncer put him in a headlock and threw him to the ground. (V9:T 644-45.) It was right inside where the bouncer did this, but he does not know why it happened. (V9:T 645.)

Appellant said he left, going south on 41, and then he made a U-turn and came back, going by Outer Limits. (V9:T 632-34.) They were in a Chrysler convertible, white with a black top. (V9:T 634.) Appellant said he put the top down on the car before he left. (V9:T 646.)

Appellant told the detectives it was a rental car. (V9:T 634.) It was rented by a friend, Saul Ortega. (V9:T 635.) Jorge Domensay was on the contract and was the only one who was supposed to be driving it. (V9:T 635-36.) Jorge drove the car to Outer Limits, but Appellant drove away because Jorge had been drinking. (V9:T 636.)

According to Appellant, on the way back, he stopped in the center lane almost in front of the Outer Limits, heading northbound, to see if any cars were coming behind him. (V9:T 637.) He then said he went to the next light and made a right and that was it. (V9:T 638.) He did that because Jorge told

him he was hungry and wanted to go to Denny's. (V9:T 638.) Appellant made a right and then went to the next light where Jorge told him to make a left on Cortez Road, he thinks it is. (V9:T 638-39.) However, they did not go to Denny's. Appellant said he already had two cop cars behind him, but he kept on going toward his house, finally stopping when they put the lights on and pulled him over. (V9:T 639-40.) They stopped him and there were a lot of cops there. (V9:T 640.) They did not tell him why they stopped him. (V9:T 640.)

When asked if someone approached his car and started yelling when he was stopped in the median, Appellant said yes. (V9:T 648.) Appellant said he told Jorge to look at that guy, he was coming over to them, and that was it. (V9:T 648.) The guy was yelling in Spanish. (V9:T 648.) The man was saying, "I'm going to kill you or something like that is what he was saying." (V9:T 649.) After that, Appellant heard some gunshots. (V9:T 649.) Appellant said he did not count the shots because he was so nervous. (V9:T 649.) He said he ran away. (V9:T 649.)

When asked if the gunshots came from inside the car, Appellant said, "Probably." (V9:T 650.) He said, "the only thing I can tell you is I was driving that car." (V9:T 650.)

Appellant said he does not own a gun. (V9:T 658.) When asked if there was a gun in the car he was driving, Appellant said, "I don't know." (V9:T 658.) When asked how close was he to the gunshots, Appellant said, "very close," and acknowledged they came from within the car. (V9:T 674.) Appellant denied knowing where the shots came from in the car. (V9:T 688.) Appellant denied knowing who shot the gun. (V9:T 691.)

Appellant said he has known Jorge for his whole life; he is like his brother. (V9:T 685.) He denied that Jorge has any guns. (V9:T 685.)

See Respondent's Exhibit 7: Answer Brief of Appellee, at pp. 9-22.

The evidence presented to the jury, without consideration of Freed's testimony, sufficiently established that Paz was the driver of the vehicle and the individual who shot the victim. Therefore, it cannot be concluded that the error alleged in ground two of Paz's petition "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. at 637.

Ground two does not warrant habeas corpus relief.

Paz's Reply

In his reply to Respondent's response, Paz concedes that he is not entitled to habeas relief on ground two.  But he continues to claim that he is innocent and relies on testimony from Barback Chris Watts, who testified at the first trial, but not at the second, and the testimony of Miguel Arredondo who was an occupant in the back seat of the car to support his claim. This Court disagrees, based on the evidence and eye witness trial testimony.

Accordingly, the Court orders:

That Paz's petition is denied.  The Clerk is directed to enter judgment against Paz and to close this case.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

The Court declines to issue a certificate of appealability pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts because Petitioner has failed to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(2).  Because Petitioner is not entitled to a certificate of appealability, Petitioner is not entitled to appeal in forma pauperis.

ORDERED at Tampa, Florida, on September 30, 2010.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Counsel of Record
Edgar Paz